UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN

| | | |
|---|---|---|
| THE SPORTING TIMES, LLC, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:17-CV-33-GNS |
| | ) | |
| ORION PICTURES, INC., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' AMENDED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR ATTORNEYS' FEES

Plaintiffs, The Sporting Times, LLC and The Sporting Times Franchise, LLC (collectively "The Sporting Times" or "Plaintiffs") by counsel, for their Amended Response in Opposition to Orion Pictures Corporation, Metro-Goldwyn-Mayer Studios, Inc., Podium Pictures, LLC and Rhino Films, LLC, (collectively either "MGM" or "Defendants") Motion for Award of Attorneys' Fees, state as follows:

## I.     INTRODUCTION

After running roughshod over Plaintiffs' trademark, Defendant MGM now seeks legal fees against a small-town publication following its unsuccessful attempt at protecting its intellectual property under the Lanham Act based upon this Court's decision that, at a minimum, failed to distinguish between a movie and its attendant trailer. The trailer (like all trailers) was released for a purely commercial purpose—only to garner ticket and movie sales—and therefore violated both the Lanham Act and *Plaintiffs'* own First Amendment rights. Because of Plaintiffs' shoestring budget and what they believed to be an agreement with opposing counsel, they ultimately chose not to appeal this Court's

decision. But now, *MGM improperly seeks to send a warning to trademark-holders everywhere, that they best not seek redress for MGM and the movie industry's overreach, blatant disregard, and continued poaching of others' intellectual property rights.*

More importantly, as discussed in detail below, the United States Supreme Court has recently called into question the viability of the <u>Rogers v. Grimaldi</u> decision, which is the basis for this Court's Order. Standalone, this mandates a different conclusion to this Action. Consequently, though 15 U.S.C. § 1117(a) gives a court discretion to award attorneys' fees in "exceptional" cases—the *only* exceptional thing here is the High Court's recent disdain for <u>Rogers</u>, *Plaintiffs' financial inability to properly litigate this Action to its appropriate conclusion*, and Defendants' decision to file this Motion. For these and the reasons set forth below, not only must Defendants' Motion be denied, justice mandates that the Court *sua sponte* relieve Plaintiffs from its Order dismissing their Complaint.

## II.  FACTUAL BACKGROUND

### A.  The Straightforward Litigation Arc

The Sporting Times is a small family owned business based in Bowling Green, Kentucky that produces magazines and internet articles focused on youth sports. Defendants filmed, produced, and directed a motion picture titled *Spaceman* about the drug-addicted character, Bill "Spaceman" Lee. As the Court is aware, Plaintiffs' trademark was prominently used in the movie's opening montage and, even more importantly, in the movie's promotional trailer. The trailer, of course, was published exclusively for a commercial purpose—to encourage moviegoers to watch, rent, or buy the movie.

Prior to the movie's release—but after the offending trailer was published—and as mandated by established trademark law practice, Defendants were notified by Plaintiffs'

counsel that The Sporting Times® mark was being used without permission and in an infringing manner.[1]

Though Defendants repeatedly claimed that Plaintiffs' trademark had been removed from both the film and trailer; this statement was patently false.[2] Indeed, Plaintiffs' counsel *repeatedly* verified that this was not the case, still finding it on many of the original websites—and even finding the offending trailer on Josh Duhamel's (the movie's star) Facebook page *months* after Defendants claimed that the trailer had been removed.[3]  A cursory review of the websites in which Defendants promoted their film still showed Plaintiffs' mark being used in Defendants' trailer.[4] Indeed, The Sporting Times® mark is still being used by Defendants, today.[5]

The unfortunate combination of: (1) trademark law's express directive to police one's mark (discussed below); (2) The Sporting Times' concurrent attempts to franchise the mark (which necessarily required trademark protection); and (3) Defendants' empty assurances and continued use of The Sporting Times® in the *Spaceman* promotional trailer, mandated that Plaintiffs litigate. This unfortunately but necessarily included taking on movie industry powerhouse, *MGM*. Consequently, Defendants' opening gambit—that Plaintiffs imposed a substantial financial hardship on Defendants by asking them to cease

---

[1] *See* trademark infringement notice attached as Exhibit A.

[2] See Declaration of Clare Feler Cox attached as Exhibit B, ¶ 6-9, and Declaration of Carol Hamilton attached as Exhibit C, ¶ 7-9.

[3] Plaintiffs' counsel repeatedly downloaded the offending trailer from various websites every time Defendants claimed the trailer had been removed. They also downloaded it from the Josh Duhamel's Facebook page after that claim was made. *See* Exhibit B, C. Cox Decl. ¶ 7.

[4] *See* Exhibit B, C. Cox Decl. ¶ 7.

[5]*See* Exhibit B, C. Cox Decl. ¶ 8; *see also* Exhibit C, C. Hamilton Decl. ¶ 10; *see also* SPACEMAN Movie Trailer by FRESH Movie Trailers, YouTube.com, https://www.youtube.com/watch?v=JqqgjyELg3U (last visited Feb. 12, 2018); *see also* Spaceman, Movie-List.com, https://www.movie-list.com/trailers/spaceman (last visited Feb. 12, 2018).

their infringing activities is ludicrous.[6] As is evident from the pleadings, all of the other Defendants simply allowed MGM to accept service on their behalf and allowed it to pilot the litigation.

As importantly here, Plaintiffs spent 92.2 hours researching and examining the trademark and First Amendment law prior to filing their Complaint.[7] Additionally, Ms. Cox even contacted both a competing movie studio and an individual in the television industry to discuss this Action prior to filing the Complaint. Plaintiffs' attorneys believed (despite this Court's decision to the contrary) and continue to believe, that MGM took unfair advantage of The Sporting Times mark⸺not for *any* artistic or legally protected purpose⸺but as the most expedient means of selling their "B" movie. Additionally, Plaintiffs spent an additional 81.5 hours writing a well-researched, well-argued Response to Defendants' Motion to Dismiss.[8]

Defendants specifically take exception with the fact that Ms. Cox refused to extensively detail her legal position after she: (1) was dressed-down and screamed at by Scott Rapkin on the phone;[9]  (2) received a nine-page letter from Rapkin setting forth their legal position and threatening her with Rule 11 and other sanctions; and (3) was falsely told that they had removed The Sporting Times® from their film and trailer.[10] As a baseline matter, *federal law does not require parties to give the opposing side any analysis⸺let alone a __detailed__ analysis⸺of their legal position*. Ms. Cox told Defendants that she disagreed (and continues to disagree) with their analysis and legal position. Under the

---

[6] Defs.' Mot. for Att'ys Fees & Costs as Prevailing Parties Pursuant to 15 U.S.C. § 1117(a) at 1.
[7] *See* Exhibit B, C. Cox Decl. ¶ 10.
[8] *See* Exhibit B, C. Cox Decl. ¶ 11.
[9] Scott Rapkin's brother directed Spaceman.
[10] *See* Exhibit B, C. Cox Decl. ¶ 9.

Rules, that sufficed, regardless of the number of pages and analysis they chose to send her. Indeed, Defendants do not, and cannot, cite a single Rule that would have required Ms. Cox to provide Plaintiffs' legal stance to anyone other than the Court.

Ultimately, other than Scott Rapkin's aggressive, loud, and threatening phone calls and letter, this Action followed a simple trajectory:[11] Complaint, Motion to Dismiss, Response, Reply, and done. Nothing out of the ordinary happened; even extensions of time were agreed to on both sides without objection. Obviously, discovery was never commenced. Perhaps most importantly, however, despite MGM's repeated and continued contention to the contrary, at the time Plaintiffs filed their Complaint (and while the Motion to Dismiss was being briefed), the commercial trailer was *still readily* accessible on a myriad of sites.[12]

### B. At the Absolute Minimum, Defendants' So-Called Settlement Offer was Disingenuous, at Worst it Bordered on Fraudulent

Prior to the filing deadline for appellate review, Defendants' counsel called Plaintiffs' counsel and (paraphrased) stated that Defendants were delighted with this Court's decision and threatened to file a motion for attorneys' fees—unless Plaintiffs did not appeal.[13] Taken more than a bit aback, in part because she was confident that her legal position was justified—and quite frankly, less than pleased at being threatened—Ms. Cox's initial response was that, "Defendants should do what they had to do." Nonetheless, Ms. Cox stated that the decision was Plaintiffs' to make and that she would relay the offer (read threat).[14] Ultimately, based upon the combination of Defendants' threat and

---

[11] *See* Exhibit B, C. Cox Decl. ¶ 9; *see also* Rapkin letter attached as Exhibit D.
[12] *See* Exhibit B, C. Cox Decl. ¶ 8; *see also* Exhibit C, C. Hamilton Decl. ¶ 10.
[13] *See* Exhibit B, C. Cox Decl. ¶ 12.
[14] *See* Exhibit B, C. Cox Decl. ¶ 13.

Plaintiffs' financial incapacity, they elected to forgo their appeal.[15] Surprisingly, however, Defendants' Motion still followed. According to Defendants, Ms. Cox's initial statement was proof that the offer had been declined—despite the fact that: (1) Ms. Cox ended the conversation expressly indicating that she would let Plaintiffs decide; and (2) Plaintiffs did not to appeal.

As discussed below, Plaintiffs' legal position was not only tenable, despite this Court's decision, it was right. And in truth, *the real purpose of MGM's Motion is to intimidate other small trademark holders from protesting the film industry's general abuse and overreach based upon First Amendment principles,* which they have improperly broadened and repurposed to encompass entirely commercial products. In so doing, they have eviscerated the Lanham Act.

Indeed, based upon Defendants' overreach, disingenuous tactics, and applicable law—including the United States Supreme Court's recent <u>Matal v. Tam</u>[16] decision and the Federal Circuit's December <u>*In re* Brunetti</u>[17] decision, both of which afford First Amendment protections to trademarks, *this Court should sua sponte relieve Plaintiffs from its incorrect decision under Fed. R. Civ. P. 60(b).*

## III.   ARGUMENT

### A.   Both the Lanham Act and First Amendment Law Contradict the Court's Decision—Particularly as it Relates to the Spaceman Movie Trailer

Obviously, the Court did not rule in Plaintiffs' favor on Defendants' Motion to Dismiss. Even today, (with all due respect, of course), that decision is wrong under either

---

[15] *See* Exhibit B, C. Cox Decl. ¶ 14.
[16] *See* <u>Matal v. Tam</u>, 137 S. Ct. 1744 (2017), issued after Defendants' filed their Motion to Dismiss.
[17] <u>*In re* Brunetti,</u> 877 F.3d 1330, 1357 (Fed. Cir. 2017), issued two days after this Court's Memorandum Opinion and Order.

the Lanham Act or the First Amendment, as articulated in <u>Rogers v. Grimaldi</u>.[18] Nonetheless, because of its own financial restraints, after considerable debate, Plaintiffs found it unfeasible to pursue an appeal—particularly against deep-pocketed MGM.

"The concept of commercial speech under the Lanham Act mirrors the commercial speech doctrine under the First Amendment."[19] At its core, commercial speech "encompasses 'speech that proposes a commercial transaction.'"[20] And "[e]ven if a communication falls outside 'core' commercial speech, the [U.S.] Supreme Court clarified . . . that the communication may still be considered commercial if: (1) the communication is an advertisement; (2) the communication makes reference to a specific product; and (3) the speaker has an economic motivation for the communication."[21]

In the 2017 case <u>Incarcerated Entertainment v. Warner Brothers Pictures</u>, Plaintiff, Diveroli, brought suit against Warner Brothers for promoting the movie "War Dogs" as the allegedly "*true story*" of his life as a weapons dealer—which it was not.[22] Among other things, Diveroli brought Lanham Act claims for the misleading statements made in the movie trailer, which was a commercial advertisement or promotion. In its motion to dismiss, as MGM did here, Warner Brothers claimed that the trailer was not actionable because it, "include[d] protected artistic or political speech under the First Amendment."[23] The district court, unsurprisingly, disagreed, finding that all of the hallmarks of commercial speech were present. The challenged statements were: (1) used for commercial purposes (among other things the trailer); (2) to promote the movie; and (3) plausibly included

---

[18] <u>Rogers v. Grimaldi,</u> 875 F.2d 994, 999 (2nd Cir. 1989).
[19] <u>Incarcerated Entm't, LLC v. Warner Bros. Pictures,</u> 261 F. Supp.3d 1220, 1227 (M.D. Fla. 2017).
[20] <u>Id.</u> at 1227-28 (quoting in part <u>Edward Lewis Tobinick, MD, Inc. v. Novella,</u> 848 F.3d 935, 950 (11th Cir. 2017)).
[21] <u>Id.</u> at 1228 (quoting <u>Bolger v. Youngs Drug Products Corp.,</u> 463 U.S. 60, 66-67 (1983)).
[22] <u>Warner Bros.,</u> 261 F. Supp.3d at 1225.
[23] <u>Id.</u> at 1226.

because Warner Brothers foresaw an economic advantage in their use.[24] Equally important, the court also dissected the relationship between the movie and trailer in the context of a <u>Rogers</u> test defense, noting that even though the movie was a presumptively protected work, the trailer was not: "*the fact that an underlying work is 'itself entitled to full First Amendment protection does not cloak all advertisements for the work with noncommercial status.'*"[25]

Likewise, in <u>Facenda v. N.F.L. Films</u>, the NFL produced a television documentary about a football video game.[26] In so doing, it used a well-known broadcaster's voice without permission.[27] Plaintiff sued because, in violation of the Lanham Act, the documentary's voiceover improperly suggested that the broadcaster had endorsed the video game that was the underlying subject matter of the documentary.[28] Precisely as MGM did here, defendants claimed that they were protected by <u>Rogers</u>.[29] But the Third Circuit disagreed, as a baseline noting that it applied only to titles or other *expressive* works.[30] There, the NFL claimed that its documentary about the video game was a work of "artistic expression" and that the use of the broadcaster's voice constituted an artistic choice.[31] The NFL also contended that the documentary could not be classified merely as commercial speech: "*which is defined as 'speech that does no more than propose a commercial transaction'*"[32] because, "even if the program ha[d] promotional aspects . . . they [we]re 'inextricably intertwined' with artistic and informational elements . . . and [must

---

[24] <u>Id.</u> at 1228.
[25] <u>Id.</u> (emphasis added) (quoting <u>Charles v. City of Los Angeles</u>, 697 F.3d 1146, 1152 (9th Cir. 2012)).
[26] <u>Facenda v. N.F.L. Films, Inc.,</u> 542 F.3d 1007, 1011 (3d Cir. 2008).
[27] <u>Id.</u>
[28] <u>Id.</u>
[29] <u>Id.</u> at 1015.
[30] <u>Id.</u> at 1015-16.
[31] <u>Id.</u> at 1016.
[32] <u>Id.</u> (emphasis added) (quoting <u>United States v. United Foods, Inc.,</u> 533 U.S. 405, 409 (2001)).

be] treated as 'fully protected speech.'"[33] But despite the fact that the documentary on its face resembled content programming, rather than a traditional 30 or 60 second TV advertisement, the court, nonetheless, disagreed: "*the work accused of trademark infringement in our case <u>aims to promote another creative work</u>, the video game.*"[34]

Here, the Court concluded that MGM had not infringed The Sporting Times® because its use in the Spaceman movie was "a non-trademark use."[35] But the Court failed to distinguish the Spaceman *movie*, which at best is a really bad work of art from the offending commercial *trailer, which indisputably had one purpose only—to reap ticket and movie sales—and which was*: (1) used exclusively as an advertisement; (2) to reference a specific product (the *movie*); and (3) was  produced only because MGM was economically motivated to advertise the movie and generate ticket sales with the  trailer. Indeed, this was the trailer's *only* purpose. Even assuming *arguendo* that the Spaceman movie itself was entitled to full First Amendment protection, the trailer was still not cloaked with noncommercial status.[36] Precisely like the <u>Facenda</u> documentary produced to sell a video game without the broadcaster's blessing (possibly leaving the audience to wrongly conclude he had endorsed the game), here the Spaceman trailer with Plaintiffs' mark front and center was published *only* to sell movie tickets and without The Sporting Times permission, which could lead viewers to conclude they endorsed the movie. This was precisely the point Plaintiffs originally made by citing <u>Dallas Cowboys Cheerleaders v. Pussycat Cinema</u>, where the court found defendant had both infringed and diluted plaintiff's mark in the infamous *Debbie Does Dallas* movie, in part, because by seeing the

---

[33] <u>Id.</u> at 1016-17.
[34] <u>Id.</u> at 1018 (emphasis added).
[35] Mem. Op. & Order at 9.
[36] <u>Warner Bros.,</u> 261 F. Supp.3d at 1228.

uniforms, the audience could conclude that the Dallas Cowboy Cheerleaders brand had endorsed the porn flick and compelled consumers to buy movie tickets.[37] Likewise, in Electronic Arts v. Textron, a helicopter company claimed that a video game producer had infringed its intellectual property rights by depicting its helicopters in the Battlefield 3 game.[38] On a motion to dismiss, the producer claimed that it was inoculated from suit by the Rogers test.[39] The court, however, disagreed, finding that, "[e]ven assuming that Rogers appli[ed], a proposition in dispute, [defendants'] argument fail[ed] under the second prong of the Rogers test."[40] "Textron['s] . . . allegations . . . collectively support an inference that Battlefield 3 and its advertising are misleading as to source or content."[41]

Finally, in its Lanham Act analysis, this Court incorrectly relied on Gottlieb v. Paramount Pictures, with a fact pattern inapposite to the one here.[42] Specifically there, a pinball manufacture's trademark was visible on a machine for a split second in the *background* of a movie scene. In other words, it pretended to be nothing other than what is was.[43] The Gottlieb court therefore reasoned that Paramount had not, "deliberately placed the [machine] into the scene to capitalize on the goodwill associated with" the mark, and that another machine, "could just as well have [been] substituted . . ."[44]  Indeed, the court noted that it was akin to seeing a Ford Taurus in a car chase scene.[45] But here, as a baseline matter, most decidedly  unlike Gottlieb, The Sporting Times® was *not* used

---

[37] Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 205 (2nd Cir. 1979).
[38] Electronic Arts, Inc. v. Textron Inc., 2012 WL 3042668, at *3 (N.D. Cal. July 25, 2012).
[39] Id.
[40] Id. at *3-4.
[41] Id. at *3.
[42] Mem. Op. & Order at 8 (citing Gottlieb Dev., LLC v. Paramount Pictures Corp., 590 F. Supp.2d 625 (S.D. N.Y. 2008)).
[43] Gottlieb Dev., 590 F. Supp.2d at 630.
[44] Id. at 635.
[45] Id. (citing Caterpillar Inc. v. Walt Disney Co., 287 F.Supp.2d 913, 919 (C.D. Ill. 2003)).

as mere background in a movie scene. By way of example, it would not have been actionable if it had appeared in the movie sitting on a coffee table with a teenage baseball player on the cover. Instead, however, it was used in a trailer (and movie) as if Plaintiffs were the standard bearers for drug addicted, middle-aged, washed-up, sports figures, and the movies that depict them.

In short, based upon applicable law, MGM's use of The Sporting Times® in the Spaceman movie trailer infringed Plaintiffs' trademark—without possibility of refuge within the First Amendment, and more specifically, the <u>Rogers</u> test.

## B.    Defendants are not Entitled to Attorneys' Fees Under the Lanham Act

A Court may award attorneys' fees under 15 U.S.C. § 1117(a) *only* in "exceptional cases."[46] "The purpose of this provision is to make plaintiffs whole in trademark cases where "the infringement was malicious, fraudulent, willful, or deliberate."[47]

In a *patent* infringement scenario, in <u>Octane Fitness v. ICON Health</u>, the U.S. Supreme Court held that the trial court must look at a totality of the circumstances surrounding the litigation, stating: "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."[48] Citing both the Webster and Oxford Dictionaries, it found that "exceptional" means: uncommon; rare; not ordinary; unusual; or special.[49] The  Court

---

[46] 15 U.S.C. § 1117(a).
[47] <u>Sovereign Order of Saint John of Jerusalem, Inc. v. Grady,</u> 119 F.3d 1236, 1244 (6th Cir. 1997) (citing <u>Hindu Incense v. Meadows,</u> 692 F.2d 1048, 1051 (6th Cir. 1982)).
[48] <u>Octane Fitness, LLC v. ICON Health & Fitness, Inc.,</u>134 S. Ct. 1749, 1756 (2014)
[49] <u>Id.</u>

noted that, "there is no precise rule or formula for making these determinations. . . ."[50]

Rather, "equitable discretion should be exercised," in view of the circumstances.[51]

Ultimately, <u>Octane Fitness</u> "made clear that fee awards are not to be made lightly, but are

to be reserved for cases that are . . .  well out of the mainstream."[52] The Sixth Circuit has

not expressly applied <u>Octane Fitness</u> to the Lanham Act fee shifting provision.[53] But in

<u>Slep-Tone Entertainment v. Karaoke Kandy Store</u> it noted that that the statute in <u>Octane</u>

<u>Fitness</u> is identical to the Lanham Act's, and that identical statutes should be consistently

interpreted.[54]

Just last month, the Southern District of New York refused to award attorneys' fees

in <u>Louis Vuitton Malletier v. My Other Bag</u>, even under the more lenient <u>Octane Fitness</u>

standard.[55] There, Louis Vuitton's claims related to the sale of a tote that plainly parodied

its iconic handbags.[56] Although the court "did not find th[e] case to be a particularly close

call," it nonetheless held, "mere assertions that a party's arguments were without merit

are generally unavailing[.]"[57]  Additionally, the court noted that the case was not litigated

in a vexatious or coercive manner and that "most cases awarding fees . . . involve

*substantial* litigation misconduct."[58]  There, the allegedly offending

conduct—mischaracterizing deposition testimony and filing oversized or improperly

---

[50] <u>Id.</u>

[51] <u>Id.</u> (quoting <u>Fogerty v. Fantasy, Inc.</u>, 510 U.S. 517, 534 (1994)).

[52] <u>Erfindergemeinschaft UroPep GbR v. Eli Lilly and Company</u>, 2017 WL 3044558, at *1 (E.D. Tex. July 18, 2017) (citing <u>Octane Fitness,</u> 134 S. Ct. at 1756).

[53] <u>Slep-Tone Entm't Corp. v. Karaoke Kandy Store, Inc.</u>, 782 F.3d 313, 317-18 (6th Cir. 2015).

[54] <u>Id.</u> at 318

[55] <u>Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.</u>, 2018 WL 317850 at *1 (Jan. 8, 2018 S.D.N.Y.), *appeal docketed*, No. 18-293 (2nd Cir. Jan 31, 2018)

[56] <u>Id.</u> at *1.

[57] <u>Id.</u> at *2.

[58] <u>Id.</u> at *3 (emphasis original) (citing <u>Small v. Implant Direct Mfg. LLC,</u> 2014 WL 5463621, at *4 (S.D. N.Y. Oct. 23, 2014)).

spaced briefs without permission—"c[a]me nowhere near qualifying as 'exceptional' for purposes of awarding attorneys' fees."[59] Finally, the court noted that while Louis Vuitton may have a reputation "as a trademark bully," it was "sensitive to the fact that the law compels trademark owners to police their marks or risk losing their rights."[60] Louis Vuitton, therefore, had: "good reason . . . to aggressively seek enforcement of its mark, and a court should proceed cautiously before imposing fees on a trademark owner, lest it present trademark owners with the Hobson's Choice of either defending their marks and risking punitive attorney's fee awards or turning a blind eye to infringement and dilution and risking the loss of their rights."[61]

In Florida Van Rentals v. Auto Mobility Sales, the court found little evidence to support the validity of Plaintiffs' trademark, but that the claims were, nonetheless, "at least colorable."[62] Despite the fact that Plaintiffs had violated a number of court orders—by failing to both timely respond to discovery requests and appear at a hearing—the totality of the circumstances, nonetheless, weighed against classifying the case as "exceptional" under Octane Fitness and no attorneys' fees were awarded.[63] Likewise, in Beastie Boys v. Monster Energy, the jury found Monster's conduct "was willful, intentionally deceptive, and in bad faith."[64] Also applying the Octane Fitness factors, the court refused to award attorneys' fees, noting that: (1) Monster had made responsible arguments; (2) the action had "no foregone conclusion;"[65] and (3) it was a "far cry from one in wh[ere] the losing party's litigation positions . . . were so 'devoid of legal merit that [the] *only* conclu[sion

---

[59] Id.

[60] Id.

[61] Id.

[62] Florida Van Rentals, Inc. v. Auto Mobility Sales, Inc., 2015 WL 4887550, at *3 (M.D. Fla. Aug. 17, 2015)

[63] Id.

[64] Beastie Boys v. Monster Energy Co., 112 F. Supp.3d 31, 46 (S.D. N.Y. 2015).

[65] Id. at 47.

was] . . . that they were advanced with an improper motive,' or constituted 'outrageous' conduct evidencing a 'complete lack of respect for the judicial process.'"[66]

Finally, in Caudill Seed v. Jarrow Formulas, the court noted that the Sixth Circuit had not yet adopted the Octane Fitness standard, but that the distinction was immaterial since attorneys' fees should not be awarded under either standard, despite the fact that Judge Heyburn found the counterclaim: "not [to be] a real counterclaim [and that it] stretch[ed] the Lanham Act pretty far."[67] Despite the court's considerable doubts, it disagreed that the claims were filed as mere leverage to force the opposing party to engage in an expensive summary judgment motion but rather it "chose to do so, and . . . prevailed"[68]—i.e., just because the litigation was costly did mean that it was unreasonably litigated.[69]

These are the same arguments that Defendants advance here. Even so, as noted above, this case was in no way "exceptional" under either Octane Fitness or the Lanham Act. Indeed, the Action concluded much earlier than warranted under applicable trademark or First Amendment law. And had The Sporting Times been able to afford to do so, it would have appealed this Court's decision on the basis that it had effectively eviscerated the Lanham Act and protected a *commercial trailer produced only to drive ticket and movie sales.* Moreover, as discussed above, this Action followed an ordinary, if brief, trajectory: (1) despite repeated assurances, the trailer was not removed; (2) Plaintiffs filed *a Complaint;* (3) the Parties disagreed on the ever-shifting landscape of

---

[66] Id. (quoting Miroban Products Co. v. API Indus., Inc., 2014 WL 1856471, at *23 (S.D. N.Y. May 8, 2014) and C=Holdings B.V. v. Asiarim Corp., 992 F.Supp.2d 223, 251 (S.D. N.Y. 2013)).

[67] Caudill Seed v. Jarrow Formulas, Inc., 2016 WL 6824401, at *3-4 (W.D. Ky. Nov. 17, 2016), *vacated*, 2017 WL 895562 (W.D. Ky. Jan 27, 2017).

[68] Id. at *5.

[69] Id.

Lanham Act and First Amendment law; and (4) a Motion to Dismiss was filed—complete with extensions of time. Given these plain vanilla facts, the Court cannot award Defendants attorneys' fees. Indeed, otherwise, fear of reprisal would effectively chill not only trademark holders' ability to protect their valued asset, but for the same reasons it would also dissuade attorneys from taking this type of case. This Action is not, *and should not be deemed*, frivolous, uncommon, rare, unordinary, or unusual. Otherwise, using the word "art" in defense of a trademark infringement claim will eviscerate the Lanham Act and the First Amendment will have entirely preempted its statutory protections.

**C.** **Even Assuming that the *Octane Fitness* Standard Applies Equally to Both Trademarks and Patent Infringement Actions, Trademark Protection Law, Nonetheless Mandates that Trademark Holders Actively Police and Protect Their Intellectual Property**

It is fundamental that trademark holders must affirmatively protect their marks or forfeit their exclusive use. Specifically, unprotected marks risk becoming a part of the consumer vernacular identifying a class of goods rather than a specific good. As stated by the court in Louis Vuitton, "an owner's trademark 'may become generic, meaning commonly used and not entitled to protection, as a result of the trademark owner's failure to police it.'" [70] For example, in Bayer v. United Drug Co., Judge Learned Hand found that buyers had come to associate the term "aspirin" as a kind of good sold—not a mark belonging exclusively to Bayer. Stated differently, Bayer's inadequate

---

[70] Louis Vuitton Malletier, S.A., 2018 WL 317850 at *3; *see also* Brandwynne v. Combe  Int'l, Ltd., 74 F. Supp.2d 364, 381 (S.D. N.Y. 1999); *see also* BellSouth Corp. v. DataNational Corp., 60 F.3d 1565, 1569-70 (Fed. Cir. 1995).

protection had so eroded its mark, that ultimately it had become generic.[71] *See also, e.g.*, <u>Miller Brewing v. G. Heileman Brewing</u>[72] (lite beer and light beer entered public domain).

Here, Defendants repeatedly assured Plaintiffs that the offending trailer had been entirely removed from the public domain. But despite these repeated assurances it was still readily available. Indeed, the offending trailer could still be found even on Josh Duhamel's (the lead actor) public Facebook page long after Plaintiffs' had been assured of their mark's removal from both the trailer and movie. In short, Defendants lied. And even today, the offending trailer can be found on at least two websites.[73] Accordingly, this Action followed. Moreover, though Defendants cite The Sporting Times' cease and desist letters as evidence of their wrongdoing entitling them to attorneys' fees, the fact of the matter is that not only are these letters standard practice—they are *required* practice. Otherwise, they risk having their valid trademark "becom[ing] a 'victim of 'genericide.'"[74] Ultimately, a decision to litigate in order to protect a trademark is far from "exceptional"; it's almost *de rigueur*—particularly where Defendants repeatedly lied about removing the offending mark.

> **D.    The U.S. Supreme Court and Federal Circuit's 2017 Decisions Provide First Amendment Protection for Trademarks and Eviscerate the *Rogers* Decision**

At its broadest, <u>Rogers v. Grimaldi</u> outlines parameters where the First Amendment protects artistic works from Lanham Act actions.[75] "Under <u>Rogers</u> a work or

---

[71] <u>Bayer Co. v. United Drug Co.,</u> 272 F. 505, 509-515 (S.D.N.Y. 1921)

[72] <u>Miller Brewing, Co. v. G. Heileman Brewing, Co.,</u> 561 F.2d 75, 79-81 (7th Cir. 1977).

[73] *See* Exhibit B, C. Cox Decl. ¶ 6-8; see also Exhibit C, C. Hamilton Decl. ¶ 10.

[74] <u>Elliott v. Google, Inc.,</u> 860 F.3d 1151, 1155–56 (9th Cir. 2017) (quoting <u>Freecycle Network, Inc. v. Oey</u>, 505 F.3d 898, 905 (9th Cir. 2007), (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 12:1 (4th ed. 1998))).

[75] <u>Parks v. LaFace Records,</u> 329 F.3d 437, 448 (6th Cir. 2003) (citing Rogers, 875 F.2d at 999).

title will be protected unless it has 'no artistic relevance' to the underlying work or, if there is artistic relevance, the title 'explicitly misleads as to the source or content of the work.'"[76] Based on Rogers, this Court's decision stands for the proposition that the so-called expressive speech contained in a *commercial* movie trailer trumps Lanham Act rights. Even assuming *arguendo* that this is true, the tension between the First Amendment rights afforded artistic endeavors and the competing First Amendment rights afforded trademark holders has recently been examined by both the U.S. Supreme Court and Federal Circuit.

In 2017, the High Court unanimously affirmed the Federal Circuit's landmark decision Matal v. Tam, holding that *the Lanham Act is entitled to its own First Amendment protections.*[77] Specifically there, an Asian-American band tried to register the band name, "The Slants."[78] The Patent and Trademark Office, however, denied the application based upon federal law prohibiting registration of trademarks disparaging persons, institutions, beliefs, or national symbols."[79] Notwithstanding, the Court found the disparagement clause violated the First Amendment's Free Speech Clause because trademarks are a form of private speech.[80] Consequently, Tam recognized that trademarks, at the very least, share equal First Amendment footing with artistic works, eviscerating Rogers' basic assertion that the Lanham Act must be narrowly construed to avoid: "overextension . . . in the areas of [movie] titles [because they] might intrude on the First Amendment."[81] In short, Tam stands for the proposition that trademarks hold equivalent First Amendment

---

[76] Id.
[77] *See* Matal v. Tam, 137 S. Ct. 1744, 1765-66 (2017) , (Alito, J. plurality opinion); and (Kennedy, J., concurring opinion).
[78] Id. at 1751.
[79] Id. (citing 15 U.S.C. § 1052(a)).
[80] Id. at 1760 and 1765-66 (Alito, J. plurality opinion) and (Kennedy, J., concurring opinion).
[81] Rogers, 875 F.2d at 998.

footing with artistic works as outlined in <u>Rogers</u>.[82] This tension mandates a balancing of the competing rights—which this Court did not do. This 2017 decision, which was reached *after* the Defendants relied upon <u>Rogers</u>, marks the first step in the application of First Amendment rights to trademarks.

On the heels of <u>Tam</u>, just days *after* this Court's decision here, came the Federal Circuit's *en banc* decision in <u>In re</u> <u>Brunetti</u>.[83] There, the Federal Circuit applied the First Amendment to the decades-long prohibition on immoral speech, allowing trademark registration of the word "FUCT." Importantly, the <u>Brunetti</u> Court recognized that, "the Supreme Court's decision in *Tam* support[ed] [thei]r conclusion that the government's interest in protecting the public from off-putting marks [wa]s an inadequate government interest for First Amendment purposes."[84] The court also stated:

> [T]hese marks make up part of the expression of everyday life, as with the names of entertainment groups, group broadcast networks, designer clothing, newspapers [*such as Plaintiff The Sporting Times*], automobiles, candy bars, toys and so on. . . . by their very purpose, trademarks exist to convey messages throughout commerce.[85]

In sum, at a minimum, <u>Tam</u> and its recent progeny, <u>Brunetti</u>, call into question the keystone of the <u>Rogers</u> decision—that artistic works are somehow worthier of First Amendment protection than trademarks. Because the Court did not consider these seminal cases—and they raise a significant question on the legal viability of this Court's

---

[82] *See* Brief of Certain Members of Congress as Amici Curiae in Support of Neither Party, at 11, <u>Matal v. Tam</u>, 137 S. Ct. 1744 (2017), 2016 W.L. 6873057 (Nov. 21, 2016) (citing <u>Rogers v. Grimaldi</u>, 875 F.2d at 998):

> Tam's invocation of the First Amendment in this case is ironic. The First Amendment, in fact, has traditionally and properly been used to *narrow* trademark holders' rights—not enlarge them.

[83] <u>In re</u> <u>Brunetti,</u> 877 F.3d 1330, 1357 (Fed. Cir. 2017).
[84] <u>Id.</u> at 1337, 57.
[85] <u>Id.</u> at 1347 (quoting in party <u>Matal v. Tam,</u> 137 S. Ct. at 1768 (Kennedy, J., concurring opinion)).

Opinion, not only are attorneys' fees unwarranted—a *sua sponte* Rule 60(b) order, relieving Plaintiffs from this Court's judgment is warranted.

### E.     Defendants' Case Law is Inapplicable

As a baseline matter, National Oilwell Varco v. Omrom Oilfield & Marine[86] and Hunter's Edge v. Primos[87] are not Lanham Act, but rather *patent cases*, and are therefore inapplicable. In National Oilwell Varco the court awarded attorneys' fees specifically because National filed suit knowing there was a crucial standing issue and concealed a critical document that, "could not have been more relevant."[88] Additionally, in Hunter's Edge v. Primos, the court found the case "exceptional" because plaintiff failed to even present a good faith argument with an even colorable claim, and because no reasonable person with even a cursory understanding of the issue could believe the design patent infringement claim could be viable.[89] Finally, Defendants' citation to SOFA Entertainment v. Dodger Productions for the proposition that attorneys' fees should be awarded when First Amendment concerns are present is also inapposite.[90] There, the court awarded attorneys' fees under the Copyright Act, which has an entirely different standard than the Lanham Act.[91] Specifically, the court held that the most important aspect in determining whether an award of attorneys' fees is warranted, is whether it would "encourage the production of original literary, artistic, and musical expression for the good of the public."[92]

---

[86] Nat'l Oilwell Varco, L.P. v. Omrom Oilfield & Marine, Inc., 2015 WL 11251773 (W.D. Tex. Aug. 28, 2015), *aff'd,* 676 Fed. Appx. 967 (Fed. Cir. 2017).
[87] Hunter's Edge, LLC v. Primos, Inc., 2016 WL 9244954 (M.D. Ala. Sept. 05, 2006).
[88] Nat'l Oilwell Varco, 2015 WL 11251773 at *6.
[89] Hunter's Edge, 2016 WL 9244954 at *4-*5.
[90] SOFA Entm't Inc. v. Dodger Prod., Inc., 709 F.3d 1273, 1280 (9th Cir. 2013).
[91] Id. at 1280-81.
[92] Id. at 1280.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, legal fees cannot be awarded under the standard set forth in either <u>Octane Fitness</u> or the Lanham Act. As Defendants intended, to do so would send a resounding message to trademark holders that their marks are worthless—particularly where a defendant hides its purely commercial use behind a First Amendment defense. Moreover, it would run entirely counter to a trademark holder's affirmative duty to protect its mark or risk death by "genericide."  More importantly, given Defendants' tactics and the recent U.S. Supreme Court and Federal Circuit First Amendment trademark law decisions, this Court should sua *sponte* relieve Plaintiffs from this Court's Order under Fed. R. Civ. P. 60(b).


Respectfully submitted,


*/s/ Clare Feler Cox*
Clare Feler Cox
Lynch, Cox, Gilman & Goodman, P.S.C.
500 W. Jefferson St., Ste. 2100
Louisville, KY 40202
(502) 589-4215
ccox@lynchcox.com
*Counsel for Plaintiffs*
*The Sporting Times, LLC and*
*Sporting Times Franchise, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of February 2018, the foregoing document was filed with the Clerk of Court using its CM/ECF filing system which will send notice of this filing to all parties registered to receive notice in this case.

/s/ Clare Feler Cox_____
Clare Feler Cox
*Counsel for Plaintiffs*
*The Sporting Times, LLC and*
*Sporting Times Franchise, LLC*

21